694 A.2d 328

ENGLESIDE AT WEST CONDOMINIUM ASSOCIATION, PLAINTIFF, v. LAND USE BOARD OF THE BOROUGH OF BEACH HAVEN, DEFENDANT.

Superior Court of New Jersey
Law Division Ocean County

Decided March 4, 1997.

*Reginald J. Raban* for plaintiff.

*Bradley W. Henson, Sr.* for defendant (*Henson & Hodgson,* attorneys).

SERPENTELLI, A.J.S.C.

This action in lieu of prerogative writs requires the court to address the unresolved issue of whether the expansion of a nonconforming structure requires a subsection c or d variance pursuant to *N.J.S.A.* 40:55D-70. The court also discusses the requisite number of votes for a use variance application before a consolidated municipal planning board, an element overlooked when the Municipal Land Use Law (hereinafter MLUL) was amended to allow for the creation of such boards.

Plaintiff seeks to reverse a decision of the Land Use Board of the Borough of Beach Haven (hereinafter Board) which denied a preliminary and final major site plan application, together with related variances concerning the proposed renovation of the Engleside at West Condominium units.

The property in question is located at the northeast corner of Engleside Avenue and West Avenue in Beach Haven and is shown as Lot 12, Block 142 on the tax map. It is in the MC-Marine Commercial zone. Multi-family residential dwellings are a permitted use in that zone at a ratio of three units per 10,000 square feet. The property has a total area of 14,093 square feet and therefore, under present regulations, could accommodate four units. However, there are now 17 condominium units on the site. Plaintiff's proposal centered on bringing the first floor elevation of the structures into compliance with the flood plain ordinance and converting the attic area of the units into a "loft" or "cupola", as it was alternately described in the record. The height of the dwellings would be increased by the addition of the loft area but would not violate existing height restrictions. A proposed decking necessitated by the elevation of the structures would increase the total lot coverage by 1.8%. Plaintiff also requested a variance from the minimum off-street parking requirements. As outlined in the Board engineer's review letter dated September 25, 1995, the following ordinance violations exist or would be created by approval of the application:

(1) proposed lot coverage of 71.5%, where a maximum of 35% is permitted;

(2) existing front setback on West Avenue of 1.2 feet, where a minimum of 15 feet is required;

(3) existing front setback on Engleside Avenue of 0.4 feet, where a minimum of 7.5 feet is required;

(4) existing side setback of 3.3 feet where a minimum of 5 feet is required;

(5) existing rear setback of 4.35 feet, where a minimum of 5 feet is required;

(6) proposed floor area of a 1 bedroom unit with a loft of approximately 625 square feet, where a minimum of 810 square feet is required;

(7) proposed floor area of a 2 bedroom unit with a loft of approximately 900 square feet, where a minimum of 975 square feet is required;

(8) No on-site parking spaces, where 20 spaces are required.

In addition to the variances, the applicant also sought site plan waivers.

The Board, which is a consolidated municipal planning board established pursuant to *N.J.S.A.* 40:55D–25(c), with an authorized membership of nine persons, determined that a special reasons variance was required because the addition of the loft area constituted an expansion of the permitted density.[1] The Board also determined that six affirmative votes would be required to approve the subsection d variance. A motion to approve the site plan application, all variances and waivers received five affirmative votes and three negative votes, one member being absent. Therefore, the application was deemed denied. This appeal followed.

Plaintiff contends that the Board erred as a matter of law in treating the application as a subsection d variance and, in any event, only five affirmative votes were necessary to approve the subsection d variance. Plaintiff further argues that since the relief required here was a subsection c variance and the application received five affirmative votes, the application should be deemed approved. Lastly, plaintiff asserts that if six affirmative votes were necessary, the Board's denial was arbitrary, capricious and unreasonable.

---

[1] It should be noted that this opinion uses the terms "special reasons variance", "use variance" and "subsection d variance" interchangeably to refer to a variance sought under *N.J.S.A.* 40:55D–70(d).

On Tuesday, January 14, 1997, the court conducted a site inspection in order to supplement the record. The property contains five one story structures. The buildings were, according to counsel, placed on the premises during the First World War to be utilized as military barracks. At the time of the inspection, construction was ongoing with regard to units fronting on Engleside Avenue which would have the effect of lifting the two structures above the flood plain. Other cosmetic work had been done on the premises but it was obvious that the structures were quite old.

The five buildings are comprised of 17 condominium units consisting of six two bedroom units and 11 one bedroom units. The Board engineer's review letter states that the one bedroom units contain approximately 385 square feet and the two bedroom units approximately 625 square feet.

An examination of a two bedroom unit revealed that all of the rooms were extremely small. The unit consisted of a living room, kitchen, two bedrooms and a bath. The attic was accessible through a retractable staircase in a hallway which abutted the bathroom, bedrooms and living room.

During the first hearing, the Board's counsel questioned the applicant's alleged failure to give notice that a variance was being sought under *N.J.S.A.* 40:55D-70(d). The applicant's counsel protested that such notice was not necessary, since the proposal did not involve an expansion of a nonconforming use, but rather an alteration of a nonconforming structure. Nonetheless, the applicant acquiesced and agreed to an adjournment so that new notices could be given.

At the beginning of the next meeting, the Board's counsel opined that since a subsection d variance was being sought and the Board was a nine member consolidated municipal planning board, the applicant would need six affirmative votes of the full authorized membership. The Board's counsel also concluded that the two alternate Board members could sit in place of the Class I and Class III members who are disqualified by *N.J.S.A.* 40:55D-25(c)

to hear a special reasons variance application. The applicant's counsel agreed that the alternates could sit in place of the Class I and Class III members but argued that only five affirmative votes were necessary to approve the application. He also renewed his assertion that the application did not involve a subsection d variance. The Board agreed with its counsel's determinations.

Parenthetically, the dispute concerning the requisite number of votes and the right of the alternates to participate in a special reasons case heard by a nine member consolidated municipal planning board, highlights a glaring omission in the MLUL. While *N.J.S.A.* 40:55D–70(d) mandates that an application made for a subsection d variance requires an affirmative vote of at least five members, in the case of a municipal zoning board, or two-thirds of the full authorized membership, in the case of a regional board, the law is silent as to the requisite vote for a use variance before a nine member consolidated municipal planning board. This issue has not been addressed in any reported decision.

On one hand, it appears consistent with the Legislature's will to require an enhanced vote in order to obtain a subsection d variance. It would be anomalous not to apply the enhanced vote to a nine member consolidated municipal planning board as presently exists by statute for local boards of adjustment and regional boards. On the other hand, in order to obtain that result, the court would be compelled to draw that inference from present legislation and, in effect, add a provision to *N.J.S.A.* 40:55D–70(d).

Likewise, the right of the alternates to participate in a special reasons application implicates conflicting policy arguments. Nothing in the statute establishing the position of alternates and defining their role, *N.J.S.A.* 40:55D–23.1, suggests they should be excluded in this special circumstance. The disqualification of Class I (mayor) and Class III (governing body) members is based on reasons which are inapplicable to the alternates. Yet, if alternates are not permitted to sit and it is determined that an affirmative vote of six members is required, the applicant faces an even more enhanced standard than the requirement of five affir-

mative votes of a seven person local zoning board or two-thirds of the full membership of a regional board. An affirmative vote of six of the seven members of the consolidated municipal board would be needed for approval if the alternates are excluded. However, if it is assumed that the alternates are to be excluded and a full membership of the Board should be construed to mean seven members in this special instance, then logically only five affirmative votes should be necessary as with a local zoning board. For reasons hereinafter discussed, these interesting questions need not be resolved in this case. Clearly, these issues call for legislative clarification.

The court's role in reviewing determinations of planning boards or zoning boards is clearly defined by case law. The interpretation of a zoning ordinance and the MLUL is purely a legal determination not entitled to a presumption of validity. The construction of legislative enactments is a judicial function and not a matter of administrative expertise. *Cherney v. Matawan Borough Zoning Board of Adjustment,* 221 *N.J.Super.* 141, 534 *A.*2d 41 (App.Div.1987); *Grancagnola v. Verona Planning Board,* 221 *N.J.Super.* 71, 533 *A.*2d 982 (App.Div.1987); *Jantausch v. Borough of Verona,* 41 *N.J.Super.* 89, 124 *A.*2d 14 (Law Div.1956); *aff'd* 24 *N.J.* 326, 131 *A.*2d 881 (1957).

As to allegations that the Board has acted in an arbitrary, capricious or unreasonable manner, the rule is otherwise. Such boards are independent administrative bodies acting in a quasi-judicial manner. *Dolan v. DeCapua,* 16 *N.J.* 599, 612, 109 *A.*2d 615 (1954). Their powers stem directly from statutory authority. *Duffcon Concrete Products v. Borough of Cresskill,* 1 *N.J.* 509, 515–16, 64 *A.*2d 347 (1949). Accordingly, a trial court must view the actions of the board as being presumptively correct. *Rexon v. Board of Adjustment of Borough of Haddonfield,* 10 *N.J.* 1, 89 *A.*2d 233 (1952). Such boards, because of their peculiar knowledge of local conditions must be allowed wide latitude in their delegated discretion. *Ward v. Scott,* 16 *N.J.* 16, 23, 105 *A.*2d 851 (1954). The burden of proof rests with the challenging party and

the standard of review is whether the decision can be found to be arbitrary, capricious or unreasonable. *Kramer v. Board of Adjustment of Sea Girt*, 45 *N.J.* 268, 212 *A.*2d 153 (1965). That decision must be made on the basis of what was before the board and not on the basis of a trial de novo. *Antonelli v. Planning Board of Borough of Waldwick*, 79 *N.J.Super.* 433, 440–41, 191 *A.*2d 788 (App.Div.1963). A trial court is not authorized to substitute its judgment where the plaintiff fails to establish in the record the assertion of arbitrariness. The court has no right to consider the matter anew and substitute its judgment for that of the board. *Peoples Trust Co. v. Hasbrouck Heights Board of Adjustment*, 60 *N.J.Super.* 569, 573, 160 *A.*2d 63 (App.Div.1959).

The threshold issue in this case, regarding under what subsection of *N.J.S.A.* 40:55D–70 relief can be granted for the expansion of a nonconforming structure, centers around the Board's determination to treat plaintiff's application as a special reasons variance. It requires the court to define precisely the distinction between a *nonconforming structure* and a *nonconforming use* as that relates to the determination of whether the applicant must obtain a subsection c or d variance. The court has not found a case directly on point and some cases appear to blur the distinction.

In *Commercial Realty v. First Atlantic*, 122 *N.J.* 546, 585 *A.*2d 928 (1991), the Court discussed the difference between prohibited uses and prohibited structures. However, it did so within the context of what constitutes a "principal structure" as that term is used in *N.J.S.A.* 40:55D–70(d)(1). The Court noted:

> We discern from [the] cases ..., that where a structure violates a dimensional restriction of a zoning ordinance but the underlying use is permitted, the required variance is dimensional, under subsection c, and not a use variance involving a prohibited structure. We need not determine here the definitive interpretation of the statutory phrase [principal structure], but we infer that it is intended to apply to zoning ordinances that restrict specific types of structures, such as churches or billboards, irrespective of their underlying uses, requiring variances from such restrictions to be processed under subsection d.... In any event, we hold that a structure containing a permitted use that deviates only from set back or height restrictions in the zoning ordinance does not constitute a 'principal structure in a

district restricted against such * * * principal structure' within the meaning of *N.J.S.A.* 40:55D–70d(1), and hence the required variances could be granted only under subsection c of *N.J.S.A.* 40:55D–70.

[*Id.* at 564–65, 585 *A.*2d 928.]

Unfortunately, the Court was not faced with the issue before this court and therefore did not confront the question of whether the *expansion* of a nonconforming structure is a subsection c or d variance.

The only case which considers this problem is *Sherman v. Harvey Cedars Board of Adjustment,* 242 *N.J.Super.* 421, 577 *A.*2d 170 (App.Div.1990). The court states in dictum:

Where a nonconforming structure is expanded in size and the addition itself does not add to the pre-existing nonconformity, the construction official can issue a building permit without the need to apply to the Board of Adjustment for a variance. *Cox, New Jersey Zoning and Land Use Administration,* § 11–4.1 (1989).

[*Id.* at 424 n. 1, 577 *A.*2d 170.]

Professor Cox does not cite any authority other than *Sherman* for the proposition that no variance at all should be required under these circumstances. Arguably, that result could be justified on the theory that no new violations are being created and the present building envelope is being maintained.

However, this court is of the view that the better rule is to require a subsection c application under those conditions. In the first instance, the structural enlargement may not be *de minimis* and could create conditions which would negatively impact the zone plan or adjacent properties. More importantly, since our law favors the ultimate elimination of nonconforming structures and uses, any effort at expansion should be scrutinized.

The law protects the continued existence of nonconforming structures and uses absent abandonment or more than partial destruction but, the right to expand is not protected. *N.J.S.A.* 40:55D–68; *Belleville v. Parrillo's, Inc.,* 83 *N.J.* 309, 315, 416 *A.*2d 388 (1980); *Grundlehner v. Dangler,* 29 *N.J.* 256, 262, 148 *A.*2d 806 (1959). Indeed, as noted, it is discouraged. To grant permits for expansions of nonconforming structures without giving the

Board a chance to review the application precludes the opportunity to inquire into the appropriateness of the expansion.

Analysis of the MLUL and existing case law provides guidance to resolve the question of whether the expansion of a nonconforming structure is a subsection c or d variance. *N.J.S.A.* 40:55D–70(d) enumerates those instances in which a use variance is required. It provides in part:

> d. In particular cases and for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming *use,* (3) deviation from a specification or standard pursuant to section 54 of P.L.1975, c. 291 (C. 40:55D–67) pertaining solely to a conditional use, (4) an increase in the permitted floor area ratio as defined in section 3.1 of P.L.1975, c. 291 (C. 40:55D–4), (5) an increase in the permitted density as defined in section 3.1 of P.L.1975, c. 291 (C. 40:55D–4), except as applied to the required lot area for a lot or lots for detached one or two dwelling unit buildings, which lot or lots are either an isolated undersized lot or lots resulting from a minor subdivision or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure. A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or 2/3 of the full authorized membership, in the case of a regional board, pursuant to article 10 of this act. (emphasis added).

It can be seen that the second enumerated ground for relief under subsection d is limited to the expansion of a nonconforming use. No reference is made to a nonconforming structure. Yet, also within the MLUL, the Legislature consciously chose to protect both nonconforming uses and structures in the adoption of *N.J.S.A.* 40:55D–68. That section states in part:

> Any nonconforming *use or structure* existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof. (emphasis added).

Therefore, it can be inferred that the Legislature has chosen, by omitting reference to a nonconforming structure in subsection d, to treat expansions of nonconforming structures as subsection c bulk variances.

That conclusion is supported by the Supreme Court's treatment of height variances. In *Commercial Realty, supra,* 122 *N.J.* 546,

585 *A*.2d 928, the Court addressed the issue of whether a height variance required an application under subsection *c* or *d*. The Court traced the legislative history of the variance power. It discerned that the Legislature's purpose was to distinguish use variances from bulk variances and impose an enhanced level of supervision over use variances. *Id.* at 561, 585 *A*.2d 928. The Court noted that although earlier drafts of the 1984 amendments to *N.J.S.A.* 40:55D–70 had included height variances within subsection d, the reference to height variances was not contained in the final version of the legislation. *Id.* at 561–62, 585 *A*.2d 928. It found the "legislative judgment to be clear and unambiguous, denominating only use variances, including expansions of nonconforming uses and deviations from standards for conditional uses, *N.J.S.A.* 40:55D–70(d)(2) and (3), density variances, and floor-area-ratio variances, as within subsection d." *Id.* at 563, 585 *A*.2d 928.

In *North Bergen Action Group v. North Bergen Township Planning Board,* 122 *N.J.* 567, 585 *A*.2d 939 (1991), which was decided on the same day as *Commercial Realty,* the Court reaffirmed its holding in *Commercial Realty* that height variances were to be considered under subsection c. Of particular importance to the present case is the following language:

> We note respondent's contention that because a municipal restriction on height can operate as a form of density regulation, variances from height, just as density variances, should be reviewed under subsection d of *N.J.S.A.* 40:55D–70. The short answer is that the Legislature has made a different judgment, apparently concluding that variances from density and floor-area ratio, but not from height, warrant the more protective standard of subsection d. We note also the obvious distinction: height restrictions may affect density, but they need not, because structures that exceed height limitations may comply with density regulations.
> [*Id.* at 576, 585 *A*.2d 939.]

Thus, taken together, *Commercial Realty* and *North Bergen* demonstrate the Supreme Court's conclusion that except for those circumstances enumerated under subsection d, applications for all other variances should be treated as seeking bulk relief under subsection c.

The Supreme Court's interpretation of the legislative intent was validated when *N.J.S.A.* 40:55D–70(d) was amended following

these decisions. The Legislature accepted the conclusion that a height variance was a bulk variance but chose to carve out an instance in which it should be treated as a subsection d variance. Thus, it added the words contained within item six of subsection d providing that a special reasons variance must be obtained where the height of the principal structure exceeds the maximum height permitted in the district by either ten feet or 10%. Apparently, the Legislature reasoned that when a height deviation reached that level of nonconformity, the resulting structure arguably could be seen as something out of character with the structures permitted in the zone and thus should be reviewed under the enhanced standards of subsection d.

As noted earlier, the Board attorney advised the Board that the applicant must seek relief under *N.J.S.A.* 40:55D–70(d). That opinion was based on counsel's conclusion that the variance sought involved an increase in density. That view would have been correct if, in fact, a change in density resulted from the application. *N.J.S.A.* 40:55D–70(d)(5). However, density is defined by the MLUL as "the permitted number of dwelling units per gross area of land to be developed." *N.J.S.A.* 40:55D–4. The applicant did not seek to increase the number of units located on the property beyond the 17 already existing. At oral argument, the Board's counsel conceded that this case did not involve an increase in density. Nonetheless, he argued that the expansion of the livable area resulted in an increased intensity of use requiring a subsection d variance.

Defendant cites no authority to support its contention that an increase in intensity requires a subsection d variance. An increase in intensity is a *factor* to be evaluated when determining whether the use of a nonconforming structure is being expanded. *Cf. Belleville v. Parrillo's, Inc.,* 83 *N.J.* 309, 314, 416 *A.*2d 388 (1980) (holding that the focus should be on the quality, character and intensity viewed in their totality with regard to their overall effect on the neighborhood and zoning plan). However, standing alone, a mere increase in intensity of a use of a structure does not

dictate that a special reasons variance be sought. In the first instance, there is nothing in subsection d to suggest that result. Furthermore, our Supreme Court in *Commercial Realty* specifically held that:

> Our conclusion that variances from height restrictions are dimensional variances cognizable only under subsection c is generally consistent with the distinction in *N.J.S.A.* 40:55D–65 a and b between use regulation, on the one hand, and the regulation of bulk, height, lot size, and *intensity of land use.*
>
> [*Commercial Realty,* 122 *N.J.* at 565, 585 *A.*2d 928. (emphasis added).]

Furthermore, as a matter of simple common sense, it is obvious that any internal modification of a structure could result in an increase in living area which, in turn, could allow for a more intense use, for example, by accommodating more people. No case has suggested that those circumstances should translate into the need to obtain a special reasons variance for an existing nonconforming structure.

It is the expansion of the structures, not the use, which necessitates the application for the variance in this case. The structures are in violation of numerous bulk requirements of the ordinance and the units within them also violate minimum square footage restrictions. The structures are also nonconforming, since they contain 17 dwelling units where only four could be constructed today. However, the use of the structures is conforming, since multi-family housing is a permitted use in the zone. As a result, the proper basis for the variance resides in *N.J.S.A.* 40:55D–70(c).

The remaining issue is also novel to our case law. As noted at the outset of the opinion, five Board members voted to approve the application. The proposal was denied because the Board had ruled that six affirmative votes were necessary. Yet, the applicant obtained the five affirmative votes that would be required under subsection c. Plaintiff's counsel argues that this result mandates that the application be approved. However, it must be remembered that the Board was instructed by its counsel at the outset of the proceedings that it should evaluate the evidence based upon the proofs required to obtain a special reasons variance. While the Board members, in voting on the

application, did not articulate adequately their reasons for voting for or against the proposal, it is to be presumed that they were following their counsel's instruction in determining whether the proofs supported a special reasons variance. Since the case was considered under subsection d and the application received the requisite votes to obtain approval under subsection c, the question remains whether the court should grant the subsection c variance, thus approving the application, or remand the case for reconsideration under subsection c.

The right to relief under subsection c of the statute rests on wholly different grounds than it does under subsection d. A variance granted pursuant to subsection c(1) requires proof of conditions peculiar to the land in question, typically described as a hardship variance. Relief under subsection c(2), sometimes referred to as a "soft c" variance, calls upon the members to determine whether the proposed benefits of the application outweigh the detriments of approval. The findings regarding subsections c(1) and c(2) naturally are not contained in the record since the Board members had no need to address them.

As a result, the court concludes that this matter must be remanded to the Board for consideration of the application pursuant to subsections c(1) and c(2) of *N.J.S.A.* 40:55D–70. The applicant should be entitled to have a full membership of the Board vote upon the application unless that is waived. The applicant can elect to present the case anew or have the matter decided on the record below. If the applicant chooses the latter, the Board's counsel must determine whether the present members of the Board are the same as those who voted at the time the application was denied. If not, any new or absent members, after having read the transcript, could vote together with members who heard the testimony. *N.J.S.A.* 40:55D–10.2; *Mercurio v. DelVecchio,* 285 *N.J.Super.* 328, 332–33, 666 *A.2d* 1368 (App.Div.1995), *certif. denied,* 144 *N.J.* 377, 676 *A.2d* 1092 (1996).